case number 20-4268 Jonas Nsongi Mbonga v. Merrick Garland oral arguments not to exceed 15 minutes per side Mr. Austin Davis for the petitioner May it please the court. Good morning. My name is Austin Davis. Are we sounding okay? Excellent. I represent the petitioner Mr. Jonas Mbonga. I would respectfully request three minutes of rebuttal time. Thank you. From the jump here, I'd like to hone in on this issue of country conditions, of the country conditions finding. The statute provides that my client had a presumption of a well-founded fear of future persecution, assuming past persecution. That fear can be rebutted if and only if two conditions are met. There was a fundamental change in country conditions and that change negated the particular fear that he had assessed. There are three questions that this presents. What is the fundamental change? Maybe more interestingly, how was that change particularized to his case and then ultimately, who had the burden and when? So to work through that, the fundamental change here, it's worth reflecting on the state of the record. There is no State Department report describing the status of politics in the Democratic Republic of the Congo during the time period alleged for this change to occur. There are about eight months between the inauguration of President Teshketi in January of 2019 and my client's most recent merits hearing in September of 19. That's not a very long time to have a changed country. When this court has found fundamental changes, it's usually had significantly more to latch on to as a hook. We do have plenty of case law suggesting that a change in the government of a country when the prior government was the government that was threatening persecution, that that change is significant, is fundamental. I mean that's plenty of the Albanian cases and many others of that sort where the old regime is kicked out and that old regime is the one that was threatening persecution. That shows a fundamental change tied to the person if the old regime was the regime that was threatening persecution of the applicant. Judge Murphy, I'm very glad you brought up those Albanian cases. Albania is a very interesting country and I think it's worth reflecting. This court, the cases cited by the respondent in this case regarding fundamental changes that come from this court are from just two countries, Albania and Mauritania, the majority from Albania. Albania underwent a dramatic transformation from the early 90s to the mid and late 2000s when most of these cases were brought. It was a totalitarian communist dictatorship. It became a free market capitalist democracy. This was in the case law. This court in Saraj had found, made judicial findings about the dramatic transformation Albania had underwent in the 15 to 20 year period. It said that we've repeatedly concluded the conditions in Albania have improved to such an extent that there is no objective basis for a well-founded fear of future persecution based on political beliefs. But doesn't that show that the general change in government, that it shows the legal point that the general change in government can be enough? As this is a review of a factual finding, I think we need to continue to focus on what facts. It's a factual finding, but you have to apply it to the law and what does the regulation mean when it says fundamental change and whether the change in government is a mixed question, I suppose. But it does suggest that our case law thinks that that mixed question can be satisfied with any type of, or not any type, but a change in government. Each of these cases involves more than a mere change of a government or a head of government. It involves a pretty dramatic transformation, not just an eight month period, but 15 years. Not just an individual who was the face of the government, but top to down executive structure, parliaments replaced, you know, the gutting of entrenched regimes. That's in all of these cases. That's not in the record we have before us. And that's where we see the distinction. Perhaps a general change of governments could be enough if there was something in the record here to demonstrate that that change was fundamental. In this record, we have a series of news articles that just describe an election occurred. We don't have more than that, which is why. I was curious, but your brief didn't challenge, most of the time in these cases, it's the State Department reports that are the basis, the evidentiary basis for the finding of a fundamental change. Here it was just the news articles. But you haven't disputed, at least not in your brief, that the news articles are somehow an unreliable source. To call them unreliable is almost, it's not the question that we believe should be asked here. It's whether or not the record would reflect a fundamental change. Those news articles put together, judged as a whole, don't constitute a fundamental change, based on looking at the cases this Court has assessed before and found these fundamental changes. We would point this Court to another Albanian case, this time in the Second Circuit, Shehu, in which there was persecution by the Socialist Party in Albania before a 2000 election. The respondent alleged there was continued persecution after, by the Socialist Party after they won re-election. We see parallels in this case. In this case, the record reflects that there was, there is a new individual, President Tshishketi, at the top of the DRC at the moment, but he doesn't control the country. The former regime continues to control the majority of power behind the presidency. This is reflected in the record. So in theory, it could be, a regime change could be enough. There's just not substantial evidence in this case to support the finding. We would support that conclusion, certainly. The, whether or not substantial evidence support, whether or not this actually constitutes a change, I think is, in our opinion, it doesn't. It's hard to have a fundamental change when there's been no genuine transfer of power. And all the other cases cited by the government involve a genuine transfer of power. So what do you mean by, what would the evidence look like? I'm just curious. Like, there would be, the parliament would also change, or the cabinet, or you would dig into the kind of guts of how the government is run and how it works, or? It's a reasonable question, where is the line? I think our line is simply that it has to be above what we have here. This record doesn't demonstrate any of the above of what you've described. We don't need a full transformation of all aspects of society in order to have a fundamental change. But you need to have a, like, the election that is the question needs to involve a transfer of power from party A to party B. And here party A maintains power. I mean, I do find it odd. I'm curious about, this is probably a question for the government, obviously, but, you know, how many years, like, would you wait? You know, one party can be in power, they could get kicked out in three years or something. Then the claim changes, or the person, you know, can come back, or, you know, I don't know what the, you know, political power changes all the time in some countries, even in this country. I don't know that we've ever had fundamental changes. I assume we're looking for more than just a party in power, right? But, you know, I don't know what the time horizon, what would your idea be of a time horizon? How would you know when a fundamental change kind of stuck? We would know a fundamental change had stuck, and I'm sounding like a broken record, if it were reflected in the record. There's a reason why we don't have a State Department report here reflecting fundamental changes, reflecting a new era of political freedom in the DRC. It's because there wasn't enough time. The State Department may work at its own timetable. I would expect within a couple years you would see something reasonable stating that things have changed in this country. But you're not going to see that report in eight months because that's just premature. The standard of a review might cut against you because, at least as I understand the board order, it was suggesting that if any, or the administrative judge's order, it was suggesting that the new president, which is the president of the party of your client, still wasn't a kind of implied power-sharing arrangement with the prior government, prior leader, and that it would be quite irrational for the prior leader to engage in harassment of the group with which it's now associating. That doesn't strike me as irrational. And if we have a substantial evidence standard of review, how could we, under that deferential standard of review, kind of overcome that finding? It is a deferential standard. We need to look to the record for probative or reasonable evidence that would demonstrate the conclusion that the administrative judge, the immigration judge, drew there. We don't have that. We just have his speculation that that is how the political structure in the DRC functions. Well, it was speculation, I suppose. It was based on the news articles. Well, the news articles provide that there may be a power-sharing agreement. It's a leap in judgment to conclude that because a power-sharing agreement exists at this particular top level, that at the lower levels we're going to see reduced extrajudicial beatings based on political beliefs, which ultimately brings us to the particularization question here. If this election, which, again, the transfer of the record reflects a no genuine transfer of power occurred, is considered a fundamental change, that change still has to be particularized to the circumstances. And there's more case law, I think, focusing on the particularization. I mean, some of the more extreme examples of major events in countries not constituting fundamental changes particularized to the individuals in question include the fall of Saddam Hussein and the fall of Slobodan Milosevic in their respective Iraq and Serbia. Just because Saddam is no longer in power in Iraq did not create a safe haven for Chaldean Christians who had fled Iraq, fled religious persecution in Iraq, and fled persecution by the Saddam regime, without more in the record demonstrating that the end of Saddam meant that the presumption could now be rebutted that these refugees had a well-founded fear of future persecution. Same for the end of the Slobodan Milosevic regime. I'd point this court to the Berger v. Gonzalez case in the Second Circuit. There they state that there was evidence in the record that the former regime still had tendrils of power throughout the system. That's exactly what we see here as well. It is the cabinet, the parliament, local and provincial level governors. The power structure continues to exist in this country such that persecution would – well, there's nothing in the record to reflect that persecution would not continue, which is, of course, the government's burden at this stage. We're really just left with this concept of an election occurred and we have very little evidence otherwise about what the state of the country is. I think it would be helpful – It just seems to me in reading these cases that while you may be arguing for what the law should be, if we're trying to figure out what the law is, it seems to me that saying that the leadership changed is probably enough to at least create a presumption that your client is not going to be persecuted. Now, if I'm right about that, and you've used the word presumption just a moment ago too, it seems to me at that point you can rebut that by simply showing that, as you're starting to say, the same people are all still in power, they're persecuting them, and there's some reason to believe they will continue. But you didn't try to do that in this case, from what I can see. You simply are saying the government didn't do enough. But if we think the government did do enough, you didn't put anything in that would rebut that. Judge McKee, I think you are ultimately correct that we didn't put anything to rebut that, but the presumption lies with my client in the first instance. And we challenge that at that first threshold, which is set forth by the statute, that there was substantial evidence to back a finding of fact. The presumption in the first place that my client held had been rebutted. I see my time is up. But if there is substantial evidence suggesting there was a regime change here, don't you have to then come back with evidence that says, yes, but this is why my client still has a well-founded or a reasonable fear? The first question is more than a regime change. Was the change of regime sufficient to rebut my client's particularized fear of local security forces persecuting him? None of the cases that address this seem to get into the specific analysis that you're talking about when they do rely on country reports. Now, I understand we don't have a country report here, but you're not saying it had to be a country report as opposed to newspaper articles. You seem to be accepting the concept that the newspaper articles were sufficient in connection with the regime change. Am I wrong about that? We accept that newspaper articles can reflect a regime change accurately, but I think the question becomes the cases the government cited, they do so in order to blur the positioning of these two burdens. And my time is concluded. Can I finish this question? Yeah, you did. You have rebuttal. Okay, thanks, counsel. We'll hear from the government. Thank you, Mr. Court. John Stanton, further respondent. Just to briefly reflect on the timeline of this particular case, the petitioner here alleged he was mistreated by the former president's regime of the PPRD party, President Kabila. I'm not sure if I'm pronouncing his name correctly. He alleged he was mistreated in 2013 and 2014. He ended up leaving the Democratic Republic of Congo in 2017, which, as far as the record shows, is the last time that anyone in the DRC was interested in him. He came to the United States in 2018. And at the end of 2018, the Democratic Republic of Congo had an election, and the candidate that was standing out, if I'm pronouncing your name correctly, President Tshiseki, who, by the way, is still currently president, would make a motion that he's still in power in the DRC. But he took office in January 2019. And in September of 2019, a few months later, as Mr. Davis points out, the United States government, DHS, submitted evidence that there had been, indeed, a change in circumstances, which we would submit to support the triggering of the rebuttal of the rock out of the eruption. Can I ask you a question about just the nature of the evidence? In most of the cases in which we have changed country conditions, it's usually State Department reports, which seem kind of more official and more reliable to me than the news articles that were presented in this case. How common is it for the board to rely, or the administrative judge, to rely on news articles to find facts about what's happening in a country? I would submit there is case law in the effect that State Department reports are the best evidence in immigration cases. But it does not appear that an official report was available at the time of this case. So the news reports and other evidence are probably the next best evidence. And there was no allegation that the news reports in this case were unreliable. I will point out that, assuming that the State Department report has since been issued, since the issuance of this fine order, and it does contain evidence supporting the petitioner, he is perfectly welcome, should this court affirm the judgment here, which I will get into, it should, that if the more recent State Department report shows that things are still the same in the DRC, well, he has a right to file a motion to reopen argument. If this evidence did not exist at the time this order was removed, he can certainly try to make his case through a motion to reopen. But for present purposes, I would respectfully submit that the record is not controversial. The DRC determination that the conditions have indeed reflected fundamental change. It wasn't just a change in the executive. I mean, there was evidence in the record that the new president released political prisoners. He was encouraging DRC exiles to return to the country because it's a new thing. He replaced some cabinet members, including female cabinet members, for the first time in the DRC. And perhaps most importantly, perhaps considering the long and unhappy history of civil strife in the DRC, there have been very few incidents of violence in the nine months that have passed since the election. Seven months, I guess. But most importantly, there have been no reports that the Petitioner's Party, the UDSP, have been harassed. Of course, the Petitioner claims that the PPRD is still controlling the shots. But there's a portion of the power-sharing agreement which courts, other courts, have agreed is enough to show a change in circumstances. And if things had not changed, what would expect reports of violence and more abuses in the past nine months after election? That's just no evidence of that here. His theory is that he might get harassed, he might get mistreated. But that's just not the standard for our asylum claims. I mean, the standard is whether it's likely he would be persecuted. I mean, is it theoretically possible if he goes back to the DRC, participates in a political march, and someone throws a group to his head? Sure, it's theoretically possible. But on this record, it's just not likely to happen. So, I mean, we cite case law in particular. Can I ask a question? And I'll ask you the same question, I guess. What is the timeline? I mean, are we safe if it's been two years and this government is still in place? I mean, it sounds like you're saying it was seven months or nine months or whatever it is. Is that the time frame? I mean, when is the board or the immigration judge, when are they supposed to be sure that something else isn't going to happen? There isn't going to be a coup or whatever could happen? I mean, well, if you take the standard, it's important not to probably guarantee that our citizens are facing the most safety issues, whether it's likely he will face persecution. But to your obvious more immediate question, as far as I can tell, no court or the board has addressed how much time is enough. I mean, I suppose, in theory, an election by itself may be sufficient. I mean, a little bit longer, the further away in time you get from an election, probably better. But in this particular case, it was seven months. And I appreciate the court's concern that it may not be enough time. As I said before, I mean, it turns out that in the past year, there's been a lot of reports of persecution or harassment against UDSP party members. Petitioner is welcome to pursue that. The revenue motion will be open later on. And Petitioner also says, and again, we do not dispute this at all, that some of the same police that may have harassed him are still in security forces. But power sharing, by its very definition, requires that both parties gain power. It's a practical matter. I just don't think it's possible for a regime to have an entire top-to-bottom thing to be lifted. It's not going to replace the postman or the drug collectors with people who are members of your own party. I mean, if there's a country that does that, I'm not aware of it. But even in this case, I mean, in this court's Seraj case, the Albany case, the 2007 public decision, the petitioner made that argument, hey, there's still some policemen in power. None of those are the same policemen who abused me. And this court helped protect that argument, saying, well, there's been a change in government, and the mere possibility that these low-level policemen may still try to harass you is too speculative to support integration relief. And again, I emphasize that the last time, and on this record, the last time anyone was asking about petitioner's whereabouts was in 2017, a year and a half, May 2017, a year and a half before the election occurred. And again, considering the long and happy history of the DRC, is this power sharing maybe the best way to prevent violence? And it looks like so far, as far as this record shows, it's been working. The only instance of violence where police actually fired on a political procession was not the petitioner's party. It wasn't the PPRD party, either. It was a third-person party. There's three major parties in the DRC. I'm not sure. I believe I made that clear. But page 453 of the administrative record shows the official election results. The current president, he got 38.5% of the vote. The PPRD-backed candidate got 23.7% of the vote. And the third-party candidate got 34% of the vote. And the allegations that the current president is a puppet of the Cuomo regime came from the third-party candidate. I mean, I would—we would probably dismiss that as slow-motion talk, even in our own country. In 2016, two major presidential candidates called each other puppets as well. So, I mean, as far as the record shows, there was, at a minimum, a power-sharing agreement implemented. It seems to have curtailed violence. And there's been other changes as well. And with respect, please, with the Senate, that's enough to trigger—to rebut the presumption of a vote down in Peter. And the other thing I would like to say is, with respect to the other page, the relief—I was talking about asylum all this time. Democrat relief, humanitarian asylum, withholding and removal, and the texture of the convention against torture. I mean, those are different standards, higher standards for asylum. Fischer did not. He focused exclusively on his asylum claim. There's already a brief—he claims in his reply brief that he effectively argued for— because of the adverse credit on the issue. But the board, in its opinion, assumed credibility before it denied those—felt the denial of those other claims on the merits. So, the adverse credibility thing does not prevent abandonment of the other claims. So, I mean, the other thing I wanted to mention is, this court did—Fischer did cite— Fischer did cite this court's decision. May I repeat? I can't. I said, that's all of that. There was a decision involving Congo, and Judge Martin wrote it. Judge Pei, the Senate, started in our brief as well. But to Kate's quote, you know, there are two Congo nations. There's the Republic of Congo, and there's the Democratic Republic of Congo. DRC is the Congo in this case. This court's other decision involved the other Congo. So, the court wrote that those are two separate nations, and I understand that, and I agree. And I think that measures points. If there's no other questions, I'm happy to—and I'm happy to rush on the briefs. Okay, great. Any questions? No? Okay, thank you, counsel. We'll hear from—for our rebuttal. Let me ask you—let me ask you. The government seems to suggest that you could make a motion to reopen on the new evidence. Is that something you've thought about? Your Honor, you may have seen this in the record. We have one pending. We've actually asked this court to hold the briefing and the argument in abeyance while that motion to reopen is pending, because it's our assumption that, regardless of what happens, if it goes positively, then we'll be engaged down at that level. If it goes negatively for us, we'll be back at the Sixth Circuit, and it would have been more efficient to decide it. But there's no reason for us to—I mean, there wouldn't be any reason for us not to decide this case, I take it. Very well. We thought judicial resources, but opposing counsel objected. But you've actually filed it. We have, yes. Okay, thank you. I'd like to point—I have two points, I think, and in my very brief rebuttal to the Respondent's arguments here. First is he continues to misstate the nature of the burdens, and it brings me no pleasure to say this, but the burden first lies with my client. It shifts—I'm sorry, the presumption lies with my client in the beginning. It shifts—the burden would shift back to him if and only if the two elements are met, fundamental change that's particularized to his circumstances. But the government tries to work backwards here. It tries to state that because my client has not submitted evidence of a well-founded fear of future persecution, independent of this presumption based on past persecution, that this is somehow evidence that the government has met its burden in the first instance. That is—that's muddled thinking. That's not backed by law. The Ninth Circuit has addressed this exact issue in Camara. It's a 2010 case. It discusses how you structurally, based on statute and regulation, the burden begins with the government to demonstrate that it has rebutted the presumption before we get into this discussion of what happens today. The record was frozen, and that's where we're discussing at the first threshold. The second point I'd like to make is the concept of particularization. My client wasn't facing persecution by the former president himself. He was facing persecution based on his political beliefs by local security forces. This court and others, this court and Elana, a Romanian case, has discussed the absence of record evidence involving local persecution when there's been a national change. This is an essential part of our case. That thread is not made in the record here. Whether or not that national change in this context constitutes a fundamental change, the local security—there's nothing in the record demonstrating that extrajudicial violence on political grounds. That's an interesting point, but we have plenty of other cases that find that the government met its presumption by relying on State Department reports alone, and those wouldn't have had evidence of the specific situation facing the applicant. Those State Department reports, particularly in the Albanian context, do discuss, in broad strokes, local conditions. Things have gotten better on judicial violence—or, I'm sorry, extrajudicial violence, police reform, et cetera. But isn't it true that in Elana, the very State Department report that they based the decision on did have some suggestions in it that the new government still persecuted the political opponents? And that's absent in this case. That seemed to be the reason for the remand. We read the opinion to include all those together— that, yes, there was a remand based on future persecution, independent past persecution, but it also provided some insight into local conditions. That we just lack here. My time is up. Thank you for your time. Thank you, counsel. The case will be submitted. The clerk may call the next case.